UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALEXANDRE ANSARI, individually;

    Plaintiff,

-v-

No.
Hon.

MOISES JIMENEZ, in his individual
capacity; CITY OF DETROIT,
a Municipal corporation; jointly and
severally,

    Defendants.

_____

## COMPLAINT AND JURY DEMAND

NOW COMES the Plaintiff, ALEXANDRE ANSARI, individually, by and through his attorneys, MUELLER LAW FIRM, by WOLFGANG MUELLER, and files his Complaint against the Defendants, MOISES JIMENEZ, and CITY OF DETROIT, a municipal corporation, in this civil action, stating unto this Court as follows:

1. This is an action for damages brought pursuant to 42 U.S.C. §§1983 and 1998, the 4th and 14th Amendments to the United States Constitution against Defendants, MOISES JIMENEZ ("JIMENEZ"), in his individual capacity; and CITY OF DETROIT ("DETROIT"), a municipal corporation.

2. Jurisdiction is founded upon 28 U.S.C. §1331 and 28 U.S.C. §1343.

3. Forum is proper based on the situs of the incident, which occurred in the CITY OF DETROIT.

## GENERAL ALLEGATIONS

4. At all pertinent times Plaintiff, ALEXANDRE ANSARI, was a United States citizen.

5. At all pertinent times, Defendant, JIMENEZ, was employed as a Sergeant by the Detroit Police Department ("DPD"), a department of DETROIT, and was acting within the scope of his employment and under color of law.

6. JIMENEZ, as a sworn police officer, had taken an oath, the Law Enforcement Code of Ethics, that stated, in pertinent part: *"As a sworn police officer, my fundamental duty is to serve the community; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation and the peaceful against violence or disorder; and to respect the constitutional rights of all to liberty, equality and justice."*

7. Defendant, DETROIT, at all relevant times, was a municipal corporation organized under the laws of the State of Michigan.

8. Shortly after 6:00 p.m., on September 22, 2012, Rosalind Barley and her younger sister, Ileana Cuevas, drove to Barley's boyfriend, Miguel Figeroa's, house at 4238 Cicotte St. in southwest Detroit.

9. Immediately after Figeroa climbed into the back seat of Barley's car, Barley heard a series of loud noises. She did not realize the sounds were gunshots. However, upon looking out a side window, she claimed to have seen a shooter with a long gun. From the back seat, Figeroa also said he saw a man with a gun.

10. Ileana Cuevas died of a gunshot wound to the chest. Figeroa jumped out of the car and began running. He was shot in the back, leg, and face. Barley drove away and stopped at a nearby business parking lot where she realized she had been shot.

11. Police investigated but did not apprehend anyone at the scene. Figeroa, however, described the shooter as a black male in his twenties who was *"tall, poss. 6'0", fat (not sloppy) 300 lbs."*

12. On September 22, 2012, Barley was shown a photographic array which did not include Plaintiff's picture. She was unable to identify anyone in the array.

13. On September 23, 2012, Figeroa was shown a different photo array which did not include Plaintiff's picture. He did not identify anyone in the array as the shooter.

14. Thereafter, Officer-in-Charge ("OIC"), Det. Moises Jimenez, had Figeroa work with a sketch artist to complete a composite drawing.

15. Jimenez later received an anonymous tip that identified the shooter as a man named *"Sousa"* who was a Hispanic male, *"approximately 230# and 5'8"*.

16. The anonymous tipster also provided the following information about the shooter:

    a.    The suspect had a 2-inch long full beard and no moustache;

    b.    The suspect is the leader of a gang known as Sousa's and Friday's Boys;

    c.    The suspect lives in an apartment building that is located on the corner of Vernor Avenue and Green Street in Detroit;

    d.    The suspect is a heroin dealer;

    e.    The suspect owns a Chrysler 300/red/4-door/2011/MI plates with custom chrome rims mounted on the vehicle;

    f.    The suspect murdered the victim and hospitalized two other individuals with the victim because her friends were shooting at the drug addict customers of the suspect.

17. JIMENEZ deliberately chose not to investigate any of the facts given to him by the anonymous tipster.

18. On October 11, 2012, Jimenez had Figeroa view a photo array with Plaintiff's picture in it. Figeroa identified Plaintiff as the shooter.

19. The next day, Jimenez had Barley view the same array with Plaintiff's picture included in the array. She was unable to identify anyone as the shooter.

20. On or about October 13, 2012, JIMENEZ submitted his Investigator's Report/Request for Warrant to the Prosecutor's Office.

21. A warrant was approved based on JIMENEZ's Investigator's Report, and Plaintiff was arrested on or about October 15, 2012.

22. On November 19, 2012, one month after Plaintiff was arraigned and after the Preliminary Exam had begun, Jimenez had Barley and Figeroa view a live lineup that included Plaintiff. He and the other five participants were wearing orange baseball caps to hide their hair. Both Barley and Figeroa identified Plaintiff as the shooter.

23. At trial, Barley and Figeroa both identified Plaintiff as the shooter.

24. In ANSARI's defense, a witness from the neighborhood, Leola Marlow, was called to testify. She stated that she saw the shooter and, knowing ANSARI from the neighborhood, testified that he was not the shooter.

25. In rebuttal, over ANSARI's counsel's objection, OIC Jimenez was allowed to testify that when the witness gave her statement after the shooting, she was nervous, shaky, and scared.

26. On September 13, 2013, a jury convicted ALEXANDRE ANSARI of the first-degree murder of Ileana Cuevas and two counts of Assault with Intent to Commit Murder in the shootings of Rosalind Barley and Miguel Figeroa.

27. On September 27, 2013, ALEXANDRE ANSARI was given a life sentence without the possibility of parole. *Id.*

28.     Following years of unsuccessful appeals, the Federal Defenders Office ("FDO") took over the case upon appointment from federal district court Judge Judith Levy.

29.     The FDO submitted the case to the recently-formed Wayne County Conviction Integrity Unit ("CIU"), which undertook a fresh look at the case.

30.     Newly-discovered evidence from the FDO and CIU investigations included finding a synopsis of a statement of an eyewitness, Shawn Lindsey, who told police officer Aref Algarrafi that he saw a heavyset man shoot the victims and get picked up by a gold-colored Pontiac 4-door Grand Prix traveling north on Gilbert St.

31.     The synopsis of the Shawn Lindsey statement was never provided by OIC Jimenez to the Assistant Prosecuting attorney or defense counsel, in violation of *Brady v Maryland*.

32.     The withheld statement from disinterested witness, Shawn Lindsey, was material exculpatory and impeachment evidence for at least the following reasons:

   a.   It would contradict the testimony of the two witnesses who claimed Plaintiff was the shooter, Rosalind Barley and Miguel Figueroa;

   b.   It would provide exculpatory evidence by a disinterested witness who described someone with a completely different physical appearance than Plaintiff;

6

  c. It would impeach the testimony of Rosalind Barley, as it was consistent with her signed statement on September 22, 2012, at 10:40 p.m., where she identified the shooter as *"tall, poss. 6'0", fat (not sloppy) 300 lbs."*

  d. It would provide support to the testimony of the witness, Leola Marlow, who testified that she knew Plaintiff and he was not the shooter. And that the shooter was *"about 5'11" – 6'2", a big guy, maybe 300 lbs."*;

  e. It would impeach the testimony of Defendant, JIMENEZ, who testified on rebuttal that when he interviewed Ms. Marlow, she appeared nervous, shaky, and scared. JIMENEZ's testimony was intended to impeach the credibility of Ms. Marlow.

33. Other "new evidence" consisted of FBI reports that indicated a reputed big-time drug dealer, Jose Sandoval, was responsible for the shooting because of the theft of his drugs by Barley, his ex-girlfriend, and Figeroa.[1] Sandoval was present at the scene of both murders 20 minutes before and after each murder.

34. Defendant, JIMENEZ, was aware of Sandoval's connection to the murder and Plaintiff's lack of any connection to Sandoval but did not disclose it to the prosecutor, in violation of his *Brady* obligation.

35. As a result of the newly-discovered evidence, the CIU submitted the case to Wayne County prosecutor, Kym Worthy. Prosecutor Worthy agreed that

---

[1] Figeroa's brother was murdered two days after this incident. Plaintiff was charged with his murder but was later acquitted. JIMENEZ was the OIC on this case as well.

7

ALEXANDRE ANSARI was factually innocent of these crimes and agreed to a full and complete exoneration.

36. On March 15, 2019, the Wayne County Prosecutor's Office dismissed criminal charges against ALEXANDRE ANSARI. He had spent over five years in state prison by the time of his release and had been in jail and/or prison since October of 2012, a period of 6.5 years.

37. On and before September 22, 2012, the City of Detroit, by and through its final policymakers, had a custom and policy to authorize, condone, tolerate, and approve illegal and unconstitutional actions by Detroit Police Department officers and command staff.

38. The illegal and unconstitutional actions and practices included but were not limited to:

    a. Conducting inadequate investigations into serious felony cases, such as murder, to expeditiously close cases and affirmatively choosing not to develop or pursue actual leads or evidence;

    b. Knowingly and deliberately fabricating evidence to manufacture probable cause to arrest and/or strengthen a case for conviction;

    c. Knowingly and deliberately withholding material exculpatory and impeachment ("*Brady*") evidence contained in polices files, when it would be apparent to any reasonable officer that the Defendant would be entitled to such evidence.

39. Defendant, DETROIT, through its final policymakers, further maintained a custom and policy of failing to adequately train, supervise, and/or discipline officers concerning proper and constitutionally adequate evidence

collection, analysis, and disclosure, including the duty not to fabricate evidence and to disclose apparent exculpatory and impeachment evidence, such as the Shawn Lindsey statement.

40. DETROIT's customs and policies, set forth above, demonstrated deliberate indifference to the constitutional rights of its citizens, including ALEXANDRE ANSARI, and were the moving force behind the individual Defendants' constitutional violations.

41. Due to the conduct of Defendants, JIMENEZ and DETROIT, as set forth herein, Plaintiff, ALEXANDRE ANSARI, suffered the following injuries and damages:

    a. Suffering a deprivation of liberty by being wrongfully arrested, jailed, incarcerated and imprisoned for a period of over 6.5 years, including significant time spent in solitary confinement;

    b. Severe emotional distress for the period from his arrest to the present, including, but not limited to: the emotional distress of being charged with first-degree murder and felony-firearm, facing a sentence of life in prison without the possibility of parole; and being wrongfully convicted of crimes the Defendants knew he did not commit;

    c. Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

    d. Fright, shock, indignity, humiliation, outrage, and embarrassment of being wrongfully charged and imprisoned for murder;

    e. Loss of enjoyment of daily activities;

 f. Not being able to attend the funerals of several family members;

 g. Physical injuries suffered in prison;

 h. Loss of employment opportunity, past income, and future earning capacity;

 i. Restricted and/or complete loss of all forms of personal freedom and physical liberty, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, recreational activities, and personal expression;

 j. Many of Plaintiff's injuries and damages are likely to be permanent;

 k. Other damages which may be revealed through discovery.

## COUNT I

### 4TH AND 14th AMENDMENT "FABRICATION OF EVIDENCE" BY DEFENDANT JIMENEZ

42. Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

43. At all times, Plaintiff had a constitutional right, secured by the 4th and 14th Amendments, not to be seized and deprived of liberty as a result of fabrication of evidence by a government officer acting in an investigative capacity.

44. JIMENEZ violated Plaintiff's constitutional rights, set forth above, by knowingly and intentionally fabricating the identification of Plaintiff by Figueroa

10

and Barley when he showed Figueroa a photo lineup with Plaintiff's picture while JIMENEZ knew Plaintiff did not match the physical description of the shooter.

45. JIMENEZ further fabricated evidence when he knowingly manufactured the identification of Plaintiff by Figueroa and Barley by including Plaintiff in a lineup when JIMENEZ knew Plaintiff did not match the physical description of the shooter.

46. Plaintiff's constitutional right to be free from illegal seizure and continued detention based upon fabrication of evidence by a governmental official acting in an investigatory capacity was clearly established before September of 2012. *See Jackson v. City of Cleveland*, 925 F.3d 793, 825 (6th Cir. 2019), cert. denied, ** U.S. **; 140 S.Ct. 855 (2020).

47. JIMENEZ's constitutional violations resulted in Plaintiff's pre-conviction deprivation of liberty and continued detention from his arrest on or about October 15, 2012 to his conviction on September 13, 2013, a period of 334 days, or ten months and 30 days.

48. JIMENEZ's constitutional violations resulted in Plaintiff's wrongful conviction and imprisonment from September 13, 2013, to his exoneration on March 12, 2019; a period of 2,007 days, or 5 years and 6 months.

49. The total time from Plaintiff's arrest to his exoneration was 2,340 days, or six years, four months, and 26 days.

## COUNT II

## 4TH AMENDMENT MALICIOUS PROSECUTION BY DEFENDANT JIMENEZ

50. Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

51. At all times, Plaintiff had a constitutional right, secured by the 4th Amendment, not to be seized and deprived of liberty as a result of fabrication of evidence and knowingly-made false statements or material omissions by a government officer acting in an investigative capacity in order to manufacture probable cause.

52. Defendant, JIMENEZ, influenced or participated in the initiation of criminal prosecution when he deliberately and knowingly fabricated identification evidence as set forth previously.

53. JIMENEZ further influenced or participated in the initiation of criminal prosecution and Plaintiff's continued detention when he knowingly made false statements and omitted material facts in his warrant request to the warrant prosecutor and judge who signed the arrest warrant.

54. But for JIMENEZ's fabrication of evidence, probable cause would have been lacking; such conduct constituting a claim of federal "malicious prosecution" under the 4th Amendment. *Mills v. Barnard*, 869 F.3d 472, 480 (6th Cir. 2017) ("The prototypical case of malicious prosecution involves an official who

fabricates evidence that leads to the wrongful arrest or indictment of an innocent person.")

55. But for JIMENEZ's false statements and material omissions, probable cause for Plaintiff's arrest would have been lacking; such conduct constituting a claim of federal "malicious prosecution" under the 4th Amendment. *Franks v. Delaware*, 438 U.S. 154; 98 S.Ct. 267; 457 L.Ed.2d 667 (1978).

56. Plaintiff's cause of action for federal malicious prosecution became complete when criminal charges were dismissed on March 12, 2019.

57. Plaintiff's right not to be seized and continuously detained without probable cause, based upon a police officer's deliberate and knowing fabrication of evidence and false statements and material omissions to prosecutors and magistrate judges, guaranteed by the 4th and 14th Amendments, was clearly established before September of 2012. *See Gregory v. Louisville,* 444 F.3d 725, 744 n. 8 (6th Cir. 2006) (knowing fabrication of evidence to manufacture probable cause violates constitutional rights at least as early as 1992); *Franks v. Delaware*, 438 U.S. 154 (1978).

58. JIMENEZ's constitutional violations resulted in Plaintiff's pre-conviction deprivation of liberty and continued detention from his arrest on or about October 15, 2012 to his conviction on September 13, 2013, a period of 334 days, or ten months and 30 days.

13

59. JIMENEZ's constitutional violations resulted in Plaintiff's wrongful conviction and imprisonment from September 13, 2013, to his exoneration on March 12, 2019; a period of 2,007 days, or 5 years and 6 months.

## COUNT III

### 14TH AMENDMENT DUE PROCESS *"BRADY"* VIOLATIONS BY DEFENDANT JIMENEZ

60. Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

61. At all times, Plaintiff had a constitutional right, secured by the 14th Amendment, not to be deprived of due process as a result of the withholding of material exculpatory or impeachment evidence by a government officer.

62. Defendant, JIMENEZ, deliberately and knowingly, or with reckless disregard for the truth, chose not to disclose material exculpatory and impeachment evidence in his files to the prosecutor in violation of his constitutional obligation under *Brady v Maryland*, 373 US 83 (1963) and its progeny, which would have resulted in no arrest warrant being issued, or a finding of lack of probable cause at the preliminary exam or an acquittal at trial; such conduct constituting a claim for a due process "*Brady* violation" under the 14th Amendment.

63. JIMENEZ knowingly or recklessly chose not to disclose the Shawn Lindsey statement to prosecutors.

64. JIMENEZ knowingly or recklessly chose not to disclose to the

prosecutor the fact that he knew the shooting was orchestrated as a hit by reputed drug dealer, Jose Sandoval, and that Plaintiff had no connection to Sandoval.

65. JIMENEZ knowingly or recklessly chose not to disclose to the prosecutor the fact that he fabricated the Figueroa and Barley identifications of Plaintiff as the perpetrator.

66. Plaintiff's right to be provided with material exculpatory and impeachment evidence ("*Brady*" evidence), was clearly established before September of 2012. *See Moldowan v. City of Warren*, 578 F.3d. 351, 382 (6th Cir. 2009) ("In fact, at least three circuits recognized prior to August 1990, the earliest possible date for Detective Ingles' involvement in the case, that this right was clearly established.")

67. JIMENEZ's knowing and intentional due process violations was a direct and proximate cause of Plaintiff's wrongful conviction and imprisonment.

## COUNT IV

## "MONELL" LIABILITY OF DEFENDANT, CITY OF DETROIT

68. Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

69. DETROIT had a custom and policy to authorize, condone, tolerate, and approve illegal and unconstitutional actions by Detroit Police Department officers and command staff, which demonstrated "deliberate indifference" to the

constitutional rights of its citizens, and was the moving force behind the individual Defendants' violations of Plaintiff's constitutional rights.

70. DETROIT's custom and policies resulted in JIMENEZ knowingly fabricating evidence to manufacture probable cause to arrest and/or strengthen a case for conviction.

71. DETROIT's custom and policies resulted in JIMENEZ knowingly withholding material exculpatory and impeachment *"Brady"* evidence that would be apparent to any reasonable officer and should have been turned over to the prosecutor and defendant.

72. DETROIT's custom and policies resulted in JIMENEZ knowingly providing false and misleading information to the prosecutor's office, and omitting material evidence that a prosecutor or magistrate judge would want to know, in order to manufacture probable cause for Plaintiff's arrest and continued detention.

73. Due to DETROIT's policies that caused JIMENEZ to violate his constitutional rights, Plaintiff was detained without probable cause, charged with crimes he did not commit, wrongfully convicted and imprisoned, and deprived of his liberty, causing him to suffer the injuries and damages set forth herein.

74. DETROIT's policies and customs resulted in Plaintiff's pre-conviction deprivation of liberty and continued detention from his arrest on or about October 15, 2012 to his conviction on September 13, 2013, a period of 334

days, or ten months and 30 days.

75. DETROIT's policies and customs resulted in his wrongful conviction and imprisonment from September 13, 2013, to his exoneration on March 12, 2019; a period of 2,007 days, or 5 years and 6 months.

76. The total time from Plaintiff's arrest to his exoneration was 2,340 days, or six years, four months, and 26 days.

WHEREFORE, Plaintiff, ALEXANDRE ANSARI, prays for damages for his wrongful detention and imprisonment, in violation of the Constitution, as set forth above, jointly and severally as to all Defendants, including compensatory and punitive damages, costs and attorney fees, and such other and further relief as appears just and proper.

>*s/Wolfgang Mueller*
>MUELLER LAW FIRM
>Attorney for Plaintiff
>41850 W. 11 Mile Road, Ste. 101
>Novi, MI 48375
>(248) 489-9653
>wolf@wolfmuellerlaw.com
>(P43728)

Dated: March 18, 2020

## **JURY DEMAND**

Plaintiff demands a jury trial in the above-captioned matter.

                                       *s/Wolfgang Mueller*
                                       MUELLER LAW FIRM
                                       Attorney for Plaintiff
                                       41850 W. 11 Mile Road, Ste. 101
                                       Novi, MI 48375
                                       (248) 489-9653
                                       wolf@wolfmuellerlaw.com
                                       (P43728)

Dated: March 18, 2020