# EXHIBIT 1

==CONFIDENTIAL, WORK PRODUCT, NOT SUBJECT TO FOIA==

TO: Prosecutor Kym Worthy
FROM: Carole Stanyar
RE: Alexandre Ansari
==DATE: 2/14/19==

Alexandre Ansari was charged in two separate 1st degree murder/AWIM cases.

| | |
|---|---|
| Date: | 9/22/12, 6:44 p.m. |
| Charge: | 1st degree murder (1 count); AWIM (2 counts); FF (1 count) |
| Location: | On Cicotte Street, north of Michigan Avenue, Detroit |
| Victims: | Ileana Cuevas (15), the deceased; Rosalind Barley and Miguel Figueroa (injured by gunfire) |
| Perpetrator: | 300 pound BM, dreadlocks, black hoody, w/AK 47 |
| Verdict: | Hung jury followed by conviction as charged |
| Sentence: | Mandatory life |

| | |
|---|---|
| Date: | 9/26/12, 12:05 a.m. |
| Charge: | 1st degree murder (1 count); AWIM (1 count): FF (1 count) |
| Location: | On Otis Street, South of Michigan Avenue, Detroit |
| Victims: | Tommy Edwards (deceased); Erika Flores (unharmed) |
| Perpetrator: | Black male, dark clothing (Flores saw silhouette only) |
| Verdict: | Acquittal |

**Overview:**

These two cases must be viewed together inasmuch as they provide the background and support for the recommendation of the CIU. The murders were set in motion after Rosalind Barley and her new boyfriend, Miguel Figueroa allegedly stole 3.5 grams of raw heroin from Barley's ex-boyfriend, Jose Sandoval, in the Spring/Summer of 2012. Sandoval, a known drug dealer with significant ties to a Mexican Cartel, was being investigated by the DEA at the time of the murders. As a result, trackers were placed on two of his cars and his cell phones were confiscated when he was arrested for a violation of his supervised release on federal drug charges. A recent CIU review of the tracker and phone data, as well as new witness interviews, contribute significantly to our conclusion that Jose Sandoval arranged for these killings, and that persons other than Mr. Ansari carried them out.

Main characters in the CIU investigation:

| | |
|---|---|
| Alexandre Ansari: | The defendant. He has no ties with any of the people listed below. He has passed a polygraph by our examiner. He was 5'11", 175 pounds. He was a low low-level drug dealer operating in the area of the the homicides. He lived in northwest Detroit. |
| Jose Sandoval | Person believed by CIU and DEA to have ordered and orchestrated both crimes. He was never charged. |
| Ernest Lester | Probably the getaway driver, 9/22/12, never charged. Tatoos include "MURDER", "E", (Sandoval's nickname for him), and "COBRAS" (a Puerto Rican gang name). |
| Rosalind Barley | An AWIM victim, shot in the first homicide (her sister Ileana Cuevas, was killed), current girlfriend of Miguel Figueroa, ex-girlfriend of Jose Sandoval, and is suspected of orchestrating the theft of 3.5 kilograms of raw heroin from Jose Sandoval. |
| Ileana Cuevas | The deceased in the first homicide, 15 years old, sister of Rosalind Barley, believed to have been shot by accident. |
| Miguel Figueroa | New boyfriend of Barley, is believed to have stolen 3.5 kilograms of raw heroin from Sandoval with Barley's help, an AWIM victim in the first homicide. |
| "Tommy" Edwards | The deceased in second homicide, brother of Miguel Figueroa, boyfriend/spouse to Erika Flores. |
| Erika Flores | Tommy's girlfriend/spouse, sole witness in 2nd homicide, unable to identify/describe the shooter. |

Viable shooter suspects, all heavy-set black males, matching witness descriptions, but never charged:

| | |
|---|---|
| Tyrone Applewhite | He sent his own photo in a text to Sandoval shortly after the last homicide, a photo never shown to any witness. |

2

|  |  |
|---|---|
|  | This information was discovered by CIU in October 2018. It was never uncovered by DPD even though cell phones were available. |
| Dominic Crawford | First suspect of police, was placed in a single array shown only to Barley with no ID. He lives nearby, and a text to Sandoval mentions an address close to where Crawford lives. His home was raided in 2011, an AK-47 and $7000-plus seized. No other evidence linking him to Sandoval. |
| Larry Davis | A "West Warren Boy", an early prime suspect in homicides per a reliable CI tip, second suspect to be placed in an array by OIC. Not identified by Miguel Figueroa (who may be intentionally sabotaging the investigation). Inexplicably, Davis' photo array was not presented to any other witness. Other evidence links Davis to Sandoval. He had his own drug house (likely supplied by Sandoval), and his apartment is on the tracker route. |
| "Solo" | Named in CI tip as possible shooter, he fits the description of scene witnesses (heavy set black male), he lived on the path of the Sandoval tracker route. No other evidence linking him to Sandoval. |

Witnesses to Getaway on 9/22/12, 6:44 p.m., still daylight that time of year:

|  |  |
|---|---|
| Leola Marlow | 70 years old, heard shots (at dusk) and saw 300-pound black male, 40-50 years old, lumbering, pulling something off his head, fleeing to an awaiting gold getaway car in the alley behind the shooting scene, driven by a Mexican male of same approximate age as Lester. Marlowe's account matches DEA tracker info. She stated that the shooter ran east on the alley behind the scene, and the car traveled north on Gilbert toward the I-94 freeway. See Diagram. Marlowe knows Ansari and says the shooter was not Ansari. She was never shown an array or a live line-up. |

Shawn Lindsey     20-something male, saw heavy-set shooter running from alley behind the shooting scene, get into getaway car, a gold Pontiac, four-door, and leave northbound on Gilbert Street. His account is consistent with both the Sandoval DEA tracker info and with Marlowe's account. This witness was recently discovered after CIU review (Pat Little and CMS) of 2012 DPD scene reports. He was never shown an array or a live line-up. He was described in police reports, given to defense, with his name and identifying characteristics redacted in defense copy. He did not testify at trial.

**CIU findings:**

The OIC, Moises Jimenez, in this case has now admitted to deliberately failing to investigate Jose Sandoval because Sandoval is tied to a powerful Mexican drug cartel. Jimenez has family in Mexico, and Jimenez feared his family would be killed. This distorted every aspect of his investigation and the truth-finding process by:

- concealing from the defense a crucial exculpatory witness (Shawn Lindsey) who saw the 300-pound shooter (who looks nothing like Ansari), jumping into getaway car on 9/22/12, fleeing the scene consistent with other evidence;

- deliberately failing to investigate, or even review, available phone evidence which would have put Sandoval at the scene of getaway route, and in contact with the likely getaway driver, and which contained a digital photograph of a heavy set black male, sent by a heavy set black male shortly after the second homicide;

- deliberately failing to show arrays of key perpetrator suspects to reliable scene witnesses (Marlowe and Lindsey);

- advising jurors of an anonymous Crime Stoppers tip that the shooter's nickname was "Sosa", that Ansari's nickname was Sosa, but excising all information from the tip that was *in*consistent with Ansari being the "Sosa" person in the tip, a fact that defense counsel failed to point out (counsel was provided with the complete tip in discovery);

4

- injecting himself in hallway at a federal detention hearing for Sandoval, telegraphing advice to Sandoval's attorney, that he should plead to a drug conspiracy quickly (possibly to help Sandoval avoid having the homicide added to the indictment, which would have triggered the death penalty).

- deliberately failing to work with, and actively steering the case away from, an army of federal law enforcement officials who were trying to assist DPD in apprehending the perpetrators.

In addition, victims Barley and Figueroa are now believed to have also been sabotaging the investigation: concealing their theft of Sandoval's heroin, and deliberately throwing off the investigation of the real perpetrators by offering bogus descriptions, and ID's, of the shooter.

Our CIU investigation dovetails with an extensive 2012 federal investigation of Sandoval, involving DEA, U.S. Attorneys, ICE, FBI, and Border Patrol – all of whom have now been interviewed by the CIU. DEA had professionally installed trackers on two of Sandoval's recently leased vehicles. In the days prior to the murders, and on the day of first murder (9/22/12), a tracker showed movement of one of his cars in and around the route of the 9/22 getaway car, which suggests strongly that Sandoval was involved in, and the likely orchestrator of, the murder of Cuevas and the assaults on Barley and Figueroa. The tracker data is consistent with phone data showing Sandoval having phone contact with the likely perpetrators of the murder up to, and in the aftermath of, both murders.

In addition, a combination of tracker data and an eyewitness account show that a car similar to Sandoval's own vehicle passed back through the vicinity of the 9/22 homicide scene, minutes after the shooting, possibly in an attempt to determine if the planned killing had been carried out by the contract killer.

Appellate and current procedural history:

A skeletal direct appeal was presented by Attorney Jonathan Simon, raising nearly nothing, and predictably, it failed. Ansari made a pro se request to the CIU, and he filed a 2254 which is pending before Federal Judge Judy Levi.

CIU Investigations and work product completed to date:

A. **Procedural steps:**

Ansari's federal habeas was stayed pending our investigation. Ansari was polygraphed (with our full cooperation using our examiner, paid for by FDO) and he passed. In cooperation with FDO (Ansari's counsel on the habeas) and AG John Pallas (defending the habeas), we have asked for Judge Levy's assistance in unearthing confidential investigation documents from federal agencies through the use of stipulations, motions, subpoenas and protective orders.

B. **Investigation:**

1. Because of the extensive, contemporaneous federal investigation of Sandoval for the drug cartel case, I interviewed AUSA Bill Sauget. He recalled the investigation of the homicide: that a DPD homicide detective was at Sandoval's detention hearing and that Steve Fishman had asked why the detective was there. Sauget also recalled that Fishman remarked at the time, "They'll never get him on that." Sauget was instrumental in clearing the way for CMS to interview federal DEA agents.

   a) Lead DEA Agent Michelin was investigating Sandoval extensively from 2011 to 2013, and knows the federal file better than anyone. He is currently assigned to Bogata, Columbia, where he returned my call in October, 2018. He and DEA Task Force Officer Jay Anderson (on loan to DEA from Clinton Township) always believed that Sandoval was behind "the girl's" killing (they were not told about the second homicide). Michelin had a tracker professionally installed in Sandoval's car, and it was operational through the entire time period encompassed by these homicides. Michelin had a shooter suspect who he said was on the tracker route. Both he and Officer Anderson thought that Barley and Figueroa were not telling the whole story. They communicated very briefly with DPD Homicide Detective Moses Jimenez. Michelin, Jimenez and Sandoval were all in the hallway (we believe at the federal detention hearing in April 2013). Jimenez told Fishman that Sandoval had "bigger problems" than "this" case (the federal drug case). Michelin and Fishman appeared to know each other well. Jimenez convinced Michelin that "they got the guy", Michelin recalled Jimenez saying something like "he confessed" (Ansari did not confess). Having worked

closely with AUSA Sauget, and being fully familiar with Sandoval's federal investigation and prosecution, Michelin believes that if AUSA Sauget had all of our information (information that was available to Jimenez) Sauget would have charged the killings along with the pending drug charges in the same federal indictment. But Jimenez did not keep them informed, he did not ask for their continued help, and he suggested to Michelin that the case was solved, and that Jimenez had it covered. Michelin also remembers a bizarre conversation with Jimenez where Jimenez said that "the fathers" (or something very melodramatic/ Mafia-like) "had not sanctioned this killing" and so Sandoval just had to "plead and go do his time" on the federal drug case – i.e., that was "the solution". Agent Michelin thought all of it was "weird". He has been of great assistance and indicated he would gladly return to Detroit if needed in court.

b) Agents Brittany Miller, Bill Chamulak and Debbie Brown (313-617-2655) are our contacts for documents and data at the DEA. Miller gave us the DEA materials requested, including DEA witness interviews and tracker data summaries. They are trying to locate additional data stored in the DEA's own server. See para 8 below. Title III recordings are still available, but that surveillance stopped on Sandoval's phone in 2011.

c) On October 5, 2012, Sandoval was arrested on a federal supervised release violation (grounded on the August 2012 FA on Barley and Figueroa), and Sandoval's ten cell phones were seized pursuant to search warrant, with the data extracted and a report generated by the DEA in 2012. In October, 2018, the phones themselves were reviewed by CMS. There is considerable relevant information in the phones, including a very noticeable flurry of phone calls leading up to each of the two killings, and text messages on the day of the homicide putting Sandoval nearby both days (and in the exact vicinity of the 9/22/12 killing at the time it occurred) even though he lived in the Rochester-Troy area. There is also a text directing Sandoval to go to 5888 Cabot (the address does not exist) but it would be near Dominic Crawford's then-residence on Addison. Most significant is a 13-minute phone call shortly before the 9/22/12 killing, from "E" to Sandoval. "E" is Ernest Lester and his tattoos (per MDOC) are "E", "Murder" and "Cobra". Lester fits Marlowe's description of the getaway driver. On 9/26/12 (hours after the 2nd homicide), there is a text from "Ty" (Tyrone Applewhite) to Sandoval with the picture of himself (Applewhite), who is a heavy set black male. Sandoval's primary phone was extracted again by DPD, using newer software, and that

extraction was sent to Envista Forensics (at our request, FDO paying) to determine if Sandoval's deleted outgoing texts could still be restored. They cannot be restored given the age and model of the phone.

d) Agent Herrara, Macomb FBI, said that a proven reliable CI heard the description of the shooter, and deduced that the shooter might be a person nicknamed "Solo", who the CI described as a heavy-set black male who lived in the vicinity of the shooting and would have been on the Sandoval DEA tracker route. Sandoval's Blue BMW circled the block where Solo supposedly stayed in the lead up to the 9/22/12 killing. Herrara said he gave this info to two officers at DPD, including Theo Miller. His notes appear in the homicide file (were not disclosed to defense). DPD did run the name "Solo" in 2012 in their computer records, however, the Solo they found is not a heavy-set black male. We could not find another Solo fitting the heavy-set black male description.

2. The two homicide files and the FA file were reviewed and compared with the files given to defense counsel. Trial defense counsel was told nothing of any other suspect despite abundant evidence of same (with the lone exception of Barley's comment that she believed the shootings were related to her keeping Sandoval's car after they broke up). A police report was redacted to conceal Shawn Lindsey's name and physical description, thereby hiding this witness from the defense. The unredacted report was included in the files given to the CIU, albeit misfiled in the wrong homicide file.

3. Leola Marlow and her daughter were interviewed. Marlow now suffers from dementia, but she remembers that day hearing shots, gathering her grandchildren inside, then seeing the suspect run from the alley into the awaiting car. OIC Jimenez drove her to court, and they discussed details of the case. Her daughter confirms that Marlowe was still very competent when she viewed the shooter, but that at some point in the ensuing days (date unknown), Marlowe became very afraid of getting involved in a homicide investigation. We believe that fear of the real perpetrators caused her to alter her initial (truthful) account that she thought she could identify both men (shooter and driver) as she had seen them before. She knew Ansari and the shooter was not Ansari.

4. I interviewed Shawn Lindsey as well as several agents and officers who interviewed him immediately after the (9/22) Cicotte killing. He does not

8

remember much, if anything, about the incident. There were a lot of crimes in his neighborhood, he always tried to be cooperative with police, and absolutely would have told them the truth back then. "If they said I said it, I said it." Border Patrol Special Agent Mark Hall and DPD Officer Aref Algarrafi recall the incident well and together they quoted Lindsey as saying that a heavy set black male came running east in the alley, and hopped into the passenger seat of a gold Pontiac four door, which then drove north on Gilbert, toward the I-94 freeway, which would have been the most expedient escape route. At any retrial, this evidence would be admissible even in the absence of current memory by Lindsey.

5. I interviewed the dispatch officer, Steven Ford, who took the original radio call from patrol officer Tracy Moreno. Moreno told Ford that minutes after the Cicotte homicide, Rosalind Barley – in a clear excited utterance/present sense impression/Crawford-admissible statement – described a heavy set, black male shooter.

6. Using all of the foregoing information, in three separate visits to the scene, we retraced the path used by the car associated (by the DEA tracker) with Sandoval on 9/19/12 through 9/23/12. See Diagram. It is difficult to fathom how Sandoval was not involved in this killing after undertaking that exercise. Combining the data regarding the BMW tracker path and dates with what we know about where suspects Solo (per the CI), Larry Davis and Tyrone Applewhite lived in September of 2012, it is CIU's theory that Sandoval may have practiced picking one or more of them up, showed them Figueroa's house, the vacant house where the shooter hid, and instructed the driver on the getaway route – eastbound from Cicotte in the alley, northbound to I-94 – all in the lead up to the 9/22/12 killing. It is further our theory that after the 9/22/12 killing, Sandoval passed by a wounded Figueroa who had fled to a block east of the shooting, and that Sandoval would have killed Figueroa there but for the presence of a Good Samaritan.

7. I followed up on information/email excerpts found in the homicide file from Homeland Security Investigation agents, Joshua Banas and Antonio Galvin. They had interviewed a CI shortly after the two killings[1] who explained that the homicides were in retaliation for Barley and Figueroa stealing 3.5 kilograms of heroin from Sandoval. They generated a report of investigation from that interview and emailed other law enforcement in October, 2012, including DPD.

---

[1] The agents confirmed that the informant quoted by Detective Jimenez (see interview below) would not have been the same person as their CI.

9

After much resistance by Homeland Security legal counsel, Judge Levy ordered those documents produced to CMS and the AG under a protective order. There was a key discrepancy between Galvin's notes and the email-train excerpt found in the DPD Homicide file (it appears in the file as a Word document, not an actual email). Galvin says that the CI never gave the description of 5'7", 170 pounds (which would have fit Ansari). After review of the train, the error appears to be Banas's error, not DPD's. Banas did include the 5'7"/170 pound description in his email, however, it is unknown where that come from.

8. I investigated all evidence linking Sandoval cars to these murders. He leased a grey Volkswagen Golf and a blue BMW on 9/11/12 from a person who was cooperating with DEA at the time. A tracker was put on both cars. The tracker on the BMW was "hard wired" to the car's battery, while the Golf had a "slap on" tracker. The appearance of the Golf would be consistent with Marlowe and Lindsey's account, with Lindsey seeing the front of the Golf (which looks like a sedan), and Marlowe looking at the back of the Golf (which looks more like an SUV). A grey-silver car could appear as gold at sunset. Marlowe saw an hispanic male in the driver seat, which fits Lester. There is a summary of the tracker data on the BMW, which DEA agents remember generating (they recognize their own handwriting). The BMW data itself has been destroyed. There were four slap-on trackers assigned to this DEA squad in 2012. Agent Brown is committed to locating the ID # assigned to the tracker on the Golf in 2012, which would then permit the DEA's tech person to locate the Golf tracker data in the DEA's server. Tracker data showing both cars moving in tandem near the 9/22 homicide scene when it was occurring would be powerfully incriminating as to Sandoval.

9. I interviewed the widow of the deceased, Tommy Edwards, in the second case, Erika Flores. She feels like everyone kept her in the dark about who was really to blame for Tommy's murder, and as to why this all happened. She tried to speak to Rosalind Barley after Tommy was killed, and Barley claimed (very unconvincingly) that she knew nothing. They never spoke again. She continues to believe that Barley is behind all this, and she has not forgiven her. She had heard that Barley and Figueroa had done "something" to Sandoval and that this was the reason for the "hits on the family". She would not be surprised at all if it was the theft of heroin reported.

Tommy invested in a bar five months before his death. She does not believe that Tommy would have participated in stealing heroin from someone as dangerous as Sandoval ("Tommy was a steady, sensible guy"), and Flores does not believe that's where the money came from that he used to invest in the bar. Flores' account of

10

Tommy coming home to Otis Street that night and leaving to go to visit Figueroa in the hospital is consistent with the Sandoval phone evidence and the timing of the homicide. The shooter and getaway driver arrived during a very small window, when Tommy would be there and they could get a clear shot. Tommy clearly knew in advance that he, Flores and the children were potential targets. (A 9/28/12 text tip from family member "Kristina", wife of Tommy's brother Mike, said that Sandoval would kill the whole family, one by one). Tommy had moved Flores out of their Otis home after the 9/22 killing. Flores got tired of living away from home with the children, and she insisted on returning to Otis. Tommy met them there, and he was killed within 1.5 hours of his return. (Tommy texted a person named "Blaze" that he was on his way from Otis to the hospital. This phone is linked to a person named Randall Anderson of Riverview. Flores could probably tell us who this is. He texted Tommy often).

Flores is still very close with Irez Vega, the mother of Tommy and Figueroa. Flores considers Vega "family". After our initial interview, Flores told Vega, and Vega texted OIC Jimenez. In our second interview, Flores admitted that she did this.

10. I reached out to Rosalind Barley's last known contact, her grandmother. She and Barley's aunt were adamant. "Our family has been through hell. We lost someone very dear to us at a very young age. We don't care if [Ansari] did it. We don't care if he didn't do it. We don't give a **** what you do. Leave us alone. Never call anyone in our family again."

### CIU interview with OIC Jimenez:

Moses Jimenez was assigned as OIC early on to both homicide cases. He recalled Googling Jose Sandoval, and then initiating contact with the federal authorities during the first few days, but he agrees that all communication then stopped fairly quickly. According to Jimenez, even though he knew about the tracker information putting Sandoval near the scene, because he didn't have a witness ID, he wouldn't have been able to get an arrest arrant on Sandoval. However, he used next to nothing of the abundant information that was available from the federal investigation. Asked about whether or not he was interested in the Sandoval Title III phone intercepts, he said he didn't want to know anything about the phones. At one point during our interview of him, he said that he had family in Mexico, and he "didn't want to end up on the witness stand in the federal case" because he believed that the Mexican drug cartel people would kill his family in Mexico. This statement, however, is inconsistent with AUSA Bill Sauget's report (and that of

11

DEA Craig Michelin) that Jimenez showed up, (no one remembers summoning him there), to Sandoval's federal detention hearing, deliberately (and perhaps unnecessarily) showing himself to Sandoval and/or his attorney. Sandoval was not being charged with homicide in the federal case.

Jimenez claimed that he had a meeting with a "high level" drug source after the killings. This person said that the killings were in retaliation for the theft of 3.5 kilograms of raw heroin from Sandoval (consistent with the Banas-Galvin CI information). This person also assured Jimenez that the killings now were done – no one else would be killed.

Jimenez was shown the DPD police reports of the Lindsey contact, and he had no explanation for not contacting Lindsey. Prior to being shown the report, he explained (and had testified) that as OIC, one of his main responsibilities was to gather up all reports and to conduct follow-up interviews with witnesses.

### CIU interview with Alexandre Ansari:

Mr. Ansari is, and was, about 175 lbs, 5'11. He is not "heavy". He has no history of violence. A criminal history check shows only misdemeanor and dismissed cases. He lived and "worked" in the Southwest Detroit area. He admitted that prior to his arrest, he rented a motel room at the Victory Inn on Michigan Avenue where he sold drugs and allowed prostitutes (his "friends") to turn tricks there. When the Victory Inn closed, he tried to do the same thing a little further down on Michigan Ave, with less success. He owned a small home elsewhere in Detroit where he lived with his then-fiancé and her children. Ansari, who had already passed a Jim Hoppe polygraph by the time we interviewed him, appeared genuinely perplexed and clueless as to how he had even been charged. He knows none of these people – a fact confirmed by our extensive investigation. Ansari has struggled with ADHD and was diagnosed with bipolar disorder, but was cooperative and coherent during our interview. Ansari admitted (then and now) that his nickname is "Sosa", but there does not appear to be any genuine connection between that name and the actual shooter. That nickname came only from an anonymous tip that wasn't particularly credible. Ansari did, and does, have spiky dread locks which resemble those in the Figueroa composite drawing. However, according to Leola Marlow, the shooter likely wore a wig or some other kind of head covering which he pulled off and stuffed during his escape. Therefore, the dread locks – so significant to the identification of Ansari – are likely a red herring.

Months prior to either shooting, Ansari's right hand was injured (confirmed by medical records). It is not fully functional, and the injury would have made it difficult to maneuver an AK 47 (or other long gun) in the manner described by the victims. For so many reasons, he would not be anyone's choice for a hit man.

Asked why he thought he was identified by witnesses, he recalled only that he walked down Cicotte Street once wearing red (he likes red, he has no gang affiliation) and the people there gave him the "evil eye". We note that in the past, Ansari lived on Tommy's street, approximately six blocks east.

**CIU Recommendation:**

Given an abundance of new evidence demonstrating Ansari's innocence, and his passing of a polygraph exam, he should be exonerated in this case. Even if only the Shawn Lindsey new information is taken into account, relief in the form of a new trial would be warranted. Lindsey would have been a pivotal defense witness. However, there is so much more here demonstrating innocence.

Ansari's trial was the proverbial "tip of the iceberg" of the information actually available to state-federal law enforcement. Ansari was convicted based upon the anonymous Sosa tip (with all _in_consistent information excised), and the Barley-Figueroa ID's. The former was untrustworthy and inadmissible under _Crawford_, and the latter are untrustworthy based upon what we now know. At trial, the prosecution ridiculed the defense and Leola Marlow's apparently truthful account, arguing as to her description of the fleeing shooter, that because shooting often erupted in this neighborhood, she must be confused. That argument would not have been available to the prosecution had Shawn Lindsey, Special Border Agent Mark Hall, and DPD Officer Aref Algarrafi testified about Lindsey at trial. They provide a continuous connection from the shooting to what Marlowe saw. She was not confused. Moreover, Shawn Lindsey appears to be a very credible witness: he was not related to anyone involved in this case, he never talked to Marlowe about this, he is conscientious, and his account ties closely (and believably) with Marlowe's, with each recounting what they saw from their unique vantage points, viewing the fleeing shooter, the getaway, and the getaway car. Marlowe and Lindsey, together, powerfully refute the other questionable identifications of Ansari – they saw a 300-pound black male. Ansari looks nothing like that. Marlow said she knew Ansari, and the shooter was not Ansari. Figueroa and Barley, in contrast, have never told the truth about this whole situation. Their identifications are clouded by their own interest in self preservation.

There are considerable concerns that this case was not investigated adequately, which ultimately resulted in the conviction of an innocent person, three other very dangerous persons escaping punishment, and our office failing the many victims in this case. Worse, the unique special interests of both the OIC (Jimenez) and the star witnesses (Figueroa and Barley) suggest that the investigation was being deliberately diverted away from the truth, either actively (by Figueroa and Barley), or by inaction (Jimenez). As to the latter, OIC Jimenez's own statements suggest a deliberate abandonment of his responsibility – either to investigate Sandoval

himself in a diligent fashion, or to acknowledge that an irreconcilable conflict of interest prevented him from doing so.

There is ample evidence to warrant continued investigation by the WCPO homicide unit, or federal authorities, toward a possible prosecution of Jose Sandoval, the getaway driver, and the real shooter(s), although prosecution of the latter will likely be extremely difficult in light of the earlier ID's of Ansari.  OIC Jimenez should not be involved in any further investigation or prosecution of the case.  WCPO should work more cooperatively with federal authorities on this case going forward, and on other cases in the future.

**Overview of CIU findings relating to Moises Jimenez:**

The OIC in this case, Moises Jimenez, has now admitted to deliberately avoiding available investigative methods as to Jose Sandoval because Sandoval is tied to a powerful Mexican drug cartel, Jimenez has family in Mexico, and Jimenez feared his family would be killed. This bias, in turn, distorted every aspect of the truth-finding process.

- concealing from the defense a crucial defense witness who saw the 300-pound shooter (who looks nothing like Ansari), jumping into getaway car on 9/22/12, fleeing the scene consistent with other evidence;

- deliberately failing to investigate, or even review, available phone evidence which could have (and did, according to CIU investigation) put Sandoval at the scene of getaway route, and in contact with the likely getaway driver, and which contained a digital photograph of a heavy set black male, sent by a heavy set black male shortly after the second homicide;

- deliberately failing to show arrays of key perpetrator suspects to reliable scene witnesses;

- advising jurors of an anonymous Crime Stoppers tip that the shooter's nickname was "Sosa", that Ansari's nickname was Sosa, but excising all information from the tip that was *in*consistent with Ansari;

- injecting himself, in hallway of a federal detention hearing, telegraphing advice to Sandoval's attorney, that he should plead to a drug conspiracy quickly (possibly to help Sandoval avoid having the homicide added to the indictment).

- deliberately failing to work with, and actively steering the case away from, an army of federal law enforcement officials who were trying to assist DPD in apprehending the perpetrators.

In addition, victims Barley and Figueroa are now believed also to have been sabotaging the investigation: concealing their theft of Sandoval's heroin, and deliberately throwing off the investigation of the real perpetrators by offering bogus descriptions, and ID's, of the shooter.

Our CIU investigation dovetails with an extensive 2012 federal investigation of Sandoval, involving DEA, U.S. Attorneys, ICE, FBI, and Border Patrol – all of whom have now been interviewed by the CIU. DEA had Sandoval on a car "tracker" which monitored his movements in and around the route of the getaway car on 9/22/12 demonstrating to us that while he may not have been the getaway driver, he was clearly orchestrating every aspect of this killing. Tracker data is also consistent with phone data, demonstrating that Sandoval was in the vicinity and appeared to be talking to other likely perpetrators in the lead up to, and in the aftermath of, both killings.